# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 13-cv-00793-MSK-MEH

ROSAURA ESPINOZA AVILA,

      Petitioner,

v.

DAGOBERTO MARRUFO MORALES,

      Respondent,

And Concerning the Minor Children,

A.G.E.M. and A.E.M.

_____

## RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE
_____

**Michael E. Hegarty, United States Magistrate Judge**

Pending before the Court is a Petition [filed March 27, 2013; docket #1] brought pursuant to provisions of The Hague Convention on the Civil Aspects of International Child Abduction ("Convention"), 1988 WL 411501, T.I.A.S. No. 11670, S. Treaty Doc. No. 99-11, and federal legislation implementing the Convention in the United States, the International Child Abduction Remedies Act ("ICARA"), 42 U.S.C. § 11601 *et seq*. Petitioner seeks an order returning her children to their place of habitual residence in Mexico for authorities to determine custody between Petitioner and Respondent, the children's father.   Pursuant to 28 U.S.C. § 636(b)(1)(B), the motion was referred to this Court on May 16, 2013, to conduct an evidentiary hearing and to submit a report and

recommendation on the matter. (Order, docket #19.) The Court held a hearing on June 19, 2013, at which the Petitioner appeared telephonically. Her attorney appeared in person. Respondent appeared in person and was also represented by counsel. Both parties brought Spanish interpreters who assisted in the proceeding. The matter is now fully presented. For the reasons stated herein, the Court recommends that the petition be **granted**.[1]

## FINDINGS OF FACT

1.      Petitioner is a Mexican citizen residing in Durango, Mexico. [Transcript of Evidentiary Hearing, June 19, 2013 ("Transcript"), dockets ##37, 39.]

2.      Respondent is a Mexican citizen from a region close to Durango in Mexico but currently residing in Aurora, Colorado. (*Id*. at 57.) Respondent is on bond with the Department of Homeland Security and in the process of attempting to adjust his status to remain in the United States legally. (*Id.* at 195.)

---

[1] Be advised that all parties shall have ten (10) days after service hereof to serve and file any written objections in order to obtain reconsideration by the District Judge to whom this case is assigned. Fed. R. Civ. P. 72. The party filing objections must specifically identify those findings or recommendations to which the objections are being made. The District Court need not consider frivolous, conclusive or general objections. A party's failure to file such written objections to proposed findings and recommendations contained in this report may bar the party from a de novo determination by the District Judge of the proposed findings and recommendations. *United States v. Raddatz*, 447 U.S. 667, 676-83 (1980); 28 U.S.C. § 636(b)(1). Additionally, the failure to file written objections to the proposed findings and recommendations within ten (10) days after being served with a copy may bar the aggrieved party from appealing the factual findings of the Magistrate Judge that are accepted or adopted by the District Court. *Thomas v. Arm*, 474 U.S. 140, 155 (1985); *Moore v. United States*, 950 F.2d 656, 659 (10th Cir. 1991); *Niehaus v. Kansas Bar Ass'n*, 793 F.2d 1159, 1164 (10th Cir. 1986).

3.      The parties never married but had two[2] children subject to this petition: A.G.E.M, a now-11-year-old boy born July 21, 2002, and A.E.M., a now-9-year-old boy born February 24, 2004.  (*Id*. at 20-21.)  Both boys were born in Colorado and have Colorado birth certificates.  (*Id*.)

4.      The children have many family members in both the United States and in Mexico.  (*Id*. at 52, 102, 129, 144.)

5.      Petitioner, Respondent and their two sons resided together from August 2000 until December 2004, when Petitioner and the boys moved out and lived with other family members from that point until April 2010.[3]  (*Id*. at 37.)

6.      From December 2004 to April 2010, the children resided with Petitioner, and she parented them nearly exclusively.   (*Id*. at 59.)   However, photographs of Respondent with the children at progressing ages indicate he had at least some contact with the children during that time.[4]  (Trial Exhibits I, J, K, L, docket #36, attachments 6-9.)

---

[2] Petitioner has a third child, a younger daughter, who is not part of this or any other currently pending petition.  The parties dispute the paternity of the child: Respondent asserts he heard for the first time during Petitioner's telephonic testimony that the third child was not his, although the birth certificate lists him as the father. (Transcript, docket #37 at 162.)  Petitioner asserts the child is not Respondent's.  (*Id*. at 21, 73.)  The daughter was in the United States with her brothers when the events herein occurred but was returned to her mother in Mexico so is not subject to this petition.  (*Id*. at 141, 164-65.)

[3] Petitioner testified that the couple separated because Respondent was violent and used alcohol and drugs.  (*Id*. at 36.)  Respondent denies such behavior.  (*Id*. at 168.)  This dispute is not material to the Court's decision and, therefore, the Court makes no specific finding regarding it.

[4] The parties disagree about the amount of contact Respondent had with the children between December 2004 and April 2010.  Respondent and his sister both testified that Respondent saw the children every other weekend and had some overnights with them.  (*Id*. at 130-35, 167-68.)  Petitioner testified that Respondent rarely saw the children but that his family saw them frequently.  (*Id*. at 38.)  The parties

7.      Petitioner in April 2010 decided, upon the sudden death of her father in Durango, Mexico, to move to Mexico with the boys to take care of her mother.  (*Id.* at 38.)  She called Respondent the night before she left to tell him she was leaving with the children the next day, on April 27, 2010.[5]  (*Id.* at 65-67.)  Respondent did not think this was a permanent move because on two prior occasions Petitioner had traveled to Mexico with their sons, returning both times.  (*Id.* at 176-77.)

8.      Respondent asked Petitioner not to take the children with her in 2010.  (*Id.* at 169.)   Petitioner took them anyway, packing their belongings and moving to El Pueblito, Durango, Mexico, to live with Petitioner's mother.  (*Id.* at 102.)

9.      The children went to school in El Pueblito for two years.  (Trial Exhibit 3, docket #36, attachment 3.)  They were enrolled to start a third year there in the fall of 2012. (Transcript, docket #37 at 41.)  They had integrated into the family, community, and church in Durango.  (*Id.* at 47-51.)  The children had been baptized in Colorado but completed their communions and confirmations in Mexico.  (Trial Exhibit 5, docket #36, attachment 4.)   Respondent stipulated that Petitioner performed appropriate parenting of the children while they were in Mexico.  (Transcript, docket #37 at 59.)

10.     While the boys lived in Mexico during a period of two years and four months, Respondent communicated by phone with the children periodically [*id.* at 180], and his

---

also disagree about ongoing contact between the parents.  Respondent indicates an ongoing relationship [*Id.* at 161-162, 190] while Petitioner denies one [*Id.* at 38]. Again, the precise amount of time Respondent spent with his children is not material to the Court's decision and, therefore, the Court makes no specific finding regarding it.

[5]  Parties disagree whether Petitioner told Respondent on that phone call that the move would be permanent.  Petitioner asserts that she told him it was a permanent move.  (*Id.* at 65-67.)  Respondent denies that assertion.  (*Id.* at 178-79.)  Under either version, the Court's analysis does not change because the settled intent of the parents in regard to the children's habitual residence can change over time, regardless of whether that intent existed upon Petitioner's initial move, as described herein.

family visited the children in Mexico six (6) times [*id*. at 39].[6]  Respondent also sent at least some money to Mexico to support the children.[7]  (*Id*. at 180.)

11.     Respondent did not take any action through the courts to seek return of his children, nor did he seek their return in any manner in the two years and four months they were living in Mexico.  (*Id*. at 197.)

12.     Petitioner made plans for the children to visit Colorado for two weeks in the summer of 2012 before they were to return to Mexico for the school year.[8]  (*Id*. at 52.) Petitioner's mother and nephew were to travel by bus to the United States with the children (including Petitioner's daughter).  (*Id*. at 53.)

13.     Before the boys traveled to the United States, Petitioner procured Mexican birth certificates from the Mexican government.  (*Id*. at 55-56.)  Petitioner was able to do so because both of the children's parents are Mexican citizens.  (*Id*. at 57.) Petitioner intended her children to travel to the United States using their American birth certificates and return to Mexico using their Mexican birth certificates.  (*Id*. at 84.)

---

[6] Respondent asserts that he called and talked with the children every eight (8) days.  (*Id*. at 180.)  Petitioner claims Respondent "only seldom called them."  (*Id*. at 67.)  The difference is not material to the Court's analysis.

[7] Respondent's sister testified that she helped her brother send $100 every weekend for the children via wire through a third party in Durango, Mexico.  (*Id*. at 147-56.)  Respondent presented the Court with a stack of receipts for wire transfers.  (*Id*. at 146.)  The Court admitted five of them showing Respondent's sister wired funds for a total of $760 to Maricela Rojas Espinoza.  (*Id*. at 151-52.)  Petitioner testified she did not receive the money.  (*Id*. at 207.)  The Court is not persuaded by Petitioner's account of having received no funds and believes Respondent did financially support his family.  Regardless, the fact that Respondent sent funds to support the children does not alter the Court's ultimate finding regarding the outcome of the Petition.

[8] Petitioner testified that she planned the trip so the children could see her extended family.  (*Id*. at 52.)  Respondent testified that he and Petitioner planned the visit together.  (*Id*. at 182.)  The difference is not material to the Court's analysis.

14.     Petitioner's mother, nephew, and three children traveled to the United States as planned in early August 2012.[9]  (*Id*. at 105.)  Just a few days into the visit, however, Petitioner decided that her mother and nephew should end the trip and return the children to Mexico.[10] (*Id*. at 53, 105.)

15.     As the children and Petitioner's mother and nephew headed south from Denver through Colorado on a commercial bus on August 8, 2012,[11] Respondent and his sister Maria Isabel Marrufo, who also testified at the evidentiary hearing, contacted the bus company to request the bus to be stopped, claiming people were taking Respondent's children illegally.  (*Id*. at 138-39.)  Ms. Marrufo testified that the bus company agreed to pull the bus over only if police ordered the bus stopped.  (*Id*. at 139.)  Respondent and his sister sought police help to stop the bus but were denied by both the City of Denver and the City of Colorado Springs police departments; however, an unidentified City of Pueblo police officer agreed to help.  (*Id*. at 138.)

16.     The bus driver pulled the bus over and Respondent, his sister, and his girlfriend, all of whom had been following the bus, pulled behind it and waited a few minutes until

---

[9] No witness or brief provided a date for the start of the trip to the United States, but witnesses agree that the children began their return on the bus no later than August 8, 2012, as discussed in footnote six (6), *supra*.

[10] Parties disagree on why the trip was cut short.  Petitioner asserts that she became ill in Mexico and her mother became ill on her travels, so they decided to shorten the trip.  (*Id*. at 53, 85.)  Petitioner's nephew, Juan Deras, also testified that the grandmother was ill.  (*Id*. at 115-118.)  Respondent asserts that Petitioner sought the immediate return of the children to limit his time with them.  (*Id*. at 182-184.)  The Court finds it more likely that Petitioner took the children because of concerns that Respondent might attempt to keep them; however, that conclusion does not alter the ultimate analysis regarding the outcome of this Petition.

[11] Varying witnesses recollect this date differently.  Petitioner's nephew testified telephonically from Mexico and stated that the date the children were taken off the bus was August 8, 2012.  (*Id*. at 106.)  Petitioner's testimony at the evidentiary hearing indicated August 5, 2012.  (*Id*. at 53.)

the City of Pueblo police officer arrived, took the children off the bus, and gave them to Respondent.[12]  (*Id*. at 106-08, 137-39.)

17.     Respondent assured the children that he just wanted to continue their visit but would return them home to their mother in Mexico after the two-week visit.  (*Id*. at 106, 189, 200.)  Indeed, in response to the Court's inquiry, Respondent testified that had the children's visit not been shortened, he would not have interfered with their return to Mexico.  (*Id*. at 189.)

18.     Petitioner's nephew continued on the bus to Mexico. (*Id*. at 115.)  However, Petitioner's mother wanted to accompany the children back to Aurora, Colorado, so Respondent allowed her to come with them and took her back to the home of Petitioner's sister, where Petitioner's mother had stayed during her visit.  (*Id*. at 111, 114-15.)  Once there, Petitioner's mother refused to allow the youngest child to remain with Respondent, so he took only the two boys with him to his home.[13]  (*Id*. at 164.) Petitioner's mother later returned to Mexico with the third child.  (*Id*.)

19.     The day after taking the children off the bus, Respondent filed a petition for custody in Adams County District Court.[14]

---

[12] Respondent adopted his sister's testimony regarding this event.  (*Id*. at 186.) Petitioner's nephew, Juan Deras, who testified at the evidentiary hearing, said that the police officer would not consider a letter from Petitioner notarized in Mexico giving Mr. Deras and the grandmother permission to bring the children back to Mexico. (*Id*. at 106.) Mr. Deras also testified that the children were crying and holding onto their grandmother as the police officer "took them off the bus by force."  (*Id*.)

[13] Respondent further testified that he sought police help to get the third child from Petitioner's grandmother but that Petitioner's sister would not open the locked door when police were knocking, so he did not further pursue the matter.

[14] The Adams County magistrate dismissed the case on September 13, 2012, for lack of jurisdiction as Petitioner's sister appeared and informed the court that the children had resided in Mexico for the past two years.  (Trial Exhibit 2, docket #36,

20.    Respondent decided he would not allow the children to return to Mexico.[15]

21.    Meanwhile, Petitioner's efforts to talk Respondent into returning the children failed; Petitioner testified that Respondent told her via phone that she could come get the children if she wanted them.  (*Id*. at 54.)  Petitioner testified this was impossible because she could not cross the border.  (*Id*.)  Petitioner then did try, however, to enter the United States in October 2012[16] to get the children but was caught and deported. (*Id*. at 61-62.)

22.    Petitioner filed on October 8, 2012, an application with the Mexican Central Authority seeking return of the boys from the United States.  (*Id*. at 54; *see also* Trial Exhibit 2, docket #36 at 2-38.)

23.    In a letter dated October 25, 2012, the Mexican Central Authority sent Petitioner's application to the U.S. Central Authority in Washington, D.C., seeking return of the children under The Hague Convention.  (Trial Exhibit 2, docket #36 at 1.)

---

attachment 2 at 39.)  Respondent, who was petitioner in that case, failed to appear for that hearing, and the magistrate told the parties to contact the Mexican Consulate.  (*Id*.)

[15] Respondent testified that he decided not to let the children return to Mexico because Petitioner's family was "harassing" him and becoming violent with him in an effort to force him to return the children to Petitioner.  (*Id*. at 201-202.)  Respondent filed on September 14, 2012, at the Adams County Justice Center, a motion for a civil protection order against Petitioner's sister, which was granted but ultimately dismissed as of October 29, 2012.  (Answer to Complaint, docket #15, attachment 1.)  Even presuming the testimony to be true, the Court is not persuaded based on the timing of Respondent's filing for custody, one day after taking the children off the bus, that this "harassing" behavior is what precipitated his decision to retain the children in the United States.

[16] Petitioner gave no specific date for this event.  Petitioner merely asserted that the event occurred in October 2012.  (Transcript, docket #37 at 62.)  The Court assumes without finding that this was likely the first week of October, prior to Petitioner filing her application with the Mexican Central Authority on October 8, 2012. (Trial Exhibit 2, docket #36 at 2-38.)

24.     Petitioner on March 27, 2013, filed the now-pending Petition with this Court. (Petition, docket #1.)

25.     Petitioner and Respondent each filed custody cases in their respective countries, both of which are pending the outcome of this Petition.[17]

26.     The children have resided with Respondent since they were taken off the bus in early August 2012.  (Transcript, docket #37 at 141.)

## PROCEDURAL HISTORY

Petitioner filed her Petition on March 27, 2013.  (Petition, docket #1.)  Chief Judge Marcia Krieger held a hearing on April 3, 2013, to determine whether the case required an evidentiary hearing.  (Order, docket #7.)  On April 10, 2013, Chief Judge Krieger ordered parties to agree to move forward in Adams County Court through Respondent's pending custody petition or, if parties did not agree, to brief jurisdictional issues regarding whether the matter should proceed in U.S. District Court.  (Minute entry, docket #16.)  The parties, not in agreement, filed briefs on April 22, 2013, Respondent arguing the case should be heard in Adams County [brief, docket #17] and Petitioner arguing the case should properly be heard in U.S. District Court [brief, docket #18].  Chief Judge Krieger on May 16, 2013, determined that U.S. District Court in the District of Colorado has jurisdiction and referred the matter to this Court to conduct an evidentiary hearing and issue a Report and Recommendation on the matter. (Order, docket #19.)

---

[17] Petitioner filed a custody case in Mexico in late 2012 or early 2013 that remains open pending the outcome of the instant Petition.  (Petitioner's Trial Brief, docket #29 at 5.)  Respondent on April 8, 2013, filed his second custody case in Adams County District Court in Colorado.  (Respondent's Trial Brief, docket #24 at 2-3.)  In that petition, Respondent seeks custody of all three children.  (*Id*. at 3.)  Respondent's first custody case was dismissed, as discussed in footnote fourteen (14), *supra*.

**JURISDICTION**

Mexico is a signatory to the Convention.  *Nunez-Escudero v. Tice-Menley*, 58 F.3d 374, 375 (8th Cir. 1995).  The United States, also a signatory, executed ICARA to implement the provisions of the Convention.  42 U.S.C. § 11601 *et seq*.  The United States has jurisdiction over this Petition through ICARA, which states that "the courts of the States and the United States district courts shall have concurrent original jurisdiction of the actions arising under the Convention."  42 U.S.C. § 11603(a).  Further, the U.S. District Court for the District of Colorado is the appropriate venue, because the children in question are physically present in the Colorado and were so at the time of the filing of the petition.  42 U.S.C. § 11603(b).  The Convention applies to children under age 16, which includes both children here. Art. 4, Treaty Doc., at 1.

**ANALYSIS**

**I.      Legal Standard**

The Convention seeks "to protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the state of habitual residence, as well as to secure protection for rights of access."  Art. 4, Treaty Doc., at 1.  Guiding the Convention is the premise that a child's country of "habitual residence" is the place where decisions regarding children's custody and access are best made.  *See Croll v. Croll*, 229 F.3d 133, 137 (2d Cir.  2000) (citing Elisa Perez-Vera, *Explanatory Report: Hague Conference on Private International Law*, in 3 Acts and Documents of the Fourteenth Session (Child

Abduction) 426, 434-35, ¶ 34 (1980)).[18]  The Convention seeks to "restore the status quo and deter parents from crossing international borders in search of a more sympathetic court." *Nunez-Escudero v. Tice-Menley*, F.3d 374, 376 (8th Cir. 1995) (citations omitted).  A Convention analysis is therefore properly "limited to the merits of the abduction claim, not any underlying custody dispute."  *Shealy v. Shealy*, 295 F.3d 1117, 1121 (10th Cir. 2002).  Once a decision has been made regarding which contracting state has jurisdiction over the children, custody disputes are then decided in that country of habitual residence.  *Abbott v. Abbott*, 130 S. Ct. 1983, 1986 (2010) (indicating, "[t]here is no reason to doubt the ability of other contracting states to carry out their duty to make decisions in the best interest of the children.")

The Convention and ICARA cover two scenarios: the wrongful removal of a child from a place of habitual residence, or the wrongful retention of a child in a country other than his place of habitual residence.  *See* Art. 3, Treaty Doc., at 2; *see also De Silva v. Pitts*, 481 F.3d 1278, 1282 (10th Cir. 2007).  Under the Convention and ICARA, a removal or retention is considered "wrongful" if: "(a) it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and (b) at the time of the removal or retention, those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention."  Art. 3, Treaty Doc., at 3; see also *Shealy*, 295 F.3d at 1122.

---

[18] Elisa Perez-Vera "was the official Hague Conference reporter.  Her Explanatory Report is recognized as the official history and commentary on the [Convention]."  *De Silva v. Pitts*, 481 F.3d 1278, 1285 n. 5 (10th Cir. 2007) (quoting *Feder v. Evan-Feder*, 63 F.3d 217, 222 n. 7 (3d Cir. 1995)).

To establish a prima facie case of wrongful removal or retention under the Convention and ICARA, a petitioner must show by a preponderance of the evidence that (1) the habitual residence of the child immediately before the date of the alleged wrongful removal was in the foreign country; (2) the removal breached the petitioner's custody rights under the foreign country's law; and (3) the petitioner was exercising custody rights at the time of the removal. *Id.*

The Convention and ICARA require a child who has been wrongfully removed or retained to be "promptly returned unless one of the exceptions set forth in the Convention applies." 42 U.S.C. § 11603(3)(2)(A&B). The exceptions are to be narrowly construed. *De Silva*, 481 F.3d at 1285. Respondent has the burden of proving at least one of the four exceptions to return apply: (1) that petitioner was not actually exercising the custody right at the time of removal or retention, or has consented to or subsequently acquiesced in the removal or retention [Art. 3, Treaty Doc., at 2]; (2) that the proceeding was commenced more than one year after the abduction and the child has become settled in the new environment [Art. 12, Treaty Doc., at 4]; (3) that there is a grave risk that the return of the child would expose the child to physical or psychological harm [Art. 13(b), Treaty Doc., at 5]; or (4) that the return of the child "would not be permitted by the fundamental principles of the requested State relating to the protection of human rights and fundamental freedoms" [Art. 20, Treaty Doc., at 6]. Exceptions one (1) and two (2) must be shown by a preponderance of the evidence; exceptions three (3) and four (4) must be shown by clear and convincing evidence. 42 U.S.C. § 11603(e)(2)(A-B). The Court also has judicial authority to refuse to order the return of a child where "the child objects to being returned and has attained the age and

degree of maturity at which it is appropriate to take account of its views." *De Silva*, 481 F.3d at 1285 (citing Art. 13, Treaty Doc., at 4).

As the Convention has outlined the appropriate analysis, the Court will begin by considering Petitioner's burdens before determining whether exceptions apply.

## II.    Petitioner's Burden

As noted above, Petitioner must show by a preponderance of the evidence that: (1) the children's habitual residence was Mexico; (2) the alleged wrongful retention of the children in the United States was a breach of her custody rights under Mexican law; and (3) she was actually exercising those custody rights at the time of the retention. *Shealy*, 295 F.3d at 1121.

### A.    Habitual Residence

The first and by far most disputed question for the Court in this case is whether Petitioner has shown that the habitual residence of the children prior to the abduction was Mexico.[19]  Given the significance and complexity of this question, the Court begins with a general framework of how courts have construed "habitual residence," particularly involving the concept of "settled purpose."  Next, the Court examines the effect of time on a determination of habitual residence.  The Court then considers whether a parent can alter a child's habitual residence by fleeing with him or retaining him in a former habitual residence.  For this analysis, the Court must apply the Tenth Circuit's procedural directives on handling Convention petitions, particularly in regard to which party may assert which arguments.  Finally, the Court applies the law to the

---

[19] Both Petitioner [docket #40 at 2] and Respondent [Transcript, docket #37 at 15] agree that the case centers on the question of the habitual residence of the children.

Petition at hand and determines whether Petitioner has established the children's habitual residence to be Mexico.

    1.    <u>"Habitual Residence" and "Settled Purpose"</u>

The term "habitual residence" is not defined by either the Convention or ICARA. *See Kanth v. Kanth*, 231 F.3d 901, 2000 WL 1644099 (10th Cir. Nov. 2, 2000). The Tenth Circuit has explained that "a child's habitual residence is defined by examining specific facts and circumstances and is a term courts should not interpret technically or restrictively." *Id.* (citing *Zuker v. Andrews*, 2 F.Supp.2d 134, 136-37 (D. Mass. 1998), *aff'd*, 181 F.3d 81 (1st Cir. 1999)). Important factors for courts to consider include "the conduct, intentions, and agreements of the parents during the time preceding the abduction." *Id.* (citing *Feder v. Evans-Feder*, 63 F.3d 217, 223 (3d Cir. 1995)). The shared intent also can develop over time. Courts have focused on a degree of "settled purpose" as to where the children live prior to the abduction. *Id.*

> [T]here must be a degree of settled purpose. The purpose may be one or there may be several. It may be specific of general. All that the law requires is that there is a settled purpose. That is not to say that the propositous intends to stay where he is indefinitely. Indeed his purpose while settled may be for a limited period. Education, business or profession, employment, health, family or merely love of the place spring to mind as common reasons for a choice of regular abode, and there may well be many others. All that is necessary is that the purpose of living where one does has a sufficient degree of continuity to be properly described as settled.

*Id.* (citing *Feder*, 63 F.3d at 223). This "settled purpose" is a question for courts to determine based on factors such as "the conduct and overtly stated intentions and agreements of the parents during the period preceding the act of abduction." *Id.*

2.     Effect of Time on a Determination of Habitual Residence

Habitual residence can develop during the time spent in a place; even if one did not have this settled intent at the time of departure, "it could coalesce during the course of a stay abroad originally intended to be temporary."  *Mozes v. Mozes*, 239 F.3d 1067, 1075 (9th Cir. 2001).  The *Mozes* court explained that habitual residence can sometimes change, given enough time, even when one parent does not concur: "Most agree that, given enough time and positive experience, a child's life may become so firmly embedded in the new country as to make it habitually resident even though there may be lingering parental intentions to the contrary."  *Id.*   The court continued:

> [H]abitual residence is intended to be a description of a factual state of affairs, and a child *can* lose its habitual attachment to a place even without a parent's consent.  Even when there is no settled intent on the part of the parents to abandon the child's prior habitual residence, courts should find a change in habitual residence if "the objective facts point unequivocally to a person's ordinary or habitual residence being in a particular place."

*Id.* at 1081 (emphasis in original) (quoting *Zenel v. Haddow*, 1993 S.L.T. 975, 979 (Scot. 1st Div.)).  The analysis is often temporal: "If you've lived continuously in the same place for several years on end, for example, we would be hard-pressed to conclude that you had not abandoned any prior habitual residence."  *Id.*   Additionally, if children go with a parent to that parent's "native land on an open-ended basis, the child will soon begin to lose its habitual ties to any prior residence.  A parent who agrees to such an arrangement without any clear limitations may be held to have accepted this eventuality."  *Id.* at 1082.

3.      Effect of Removal of or Return to Former Habitual Residence

Courts have also made it clear that a parent cannot create a new settled purpose and therefore a new habitual residence simply by fleeing a country with a child in tow or retaining a child in his former habitual residence.  *See Feder*, 63 F.3d at 224-25. The *Feder* court dealt with a child, born in Germany to U.S. citizens, who had lived in the United States for most of his four-year-old life but who moved with his parents to Australia for the father's work.  *Id.* at 218.  There, the child was enrolled in school and the family bought a house, but the mother was never committed to remaining in Australia and after six months fled with the child back to the United States under the pretense of visiting her family.  *Id.* at 218-19.  The Third Circuit in reversing the district court found that the habitual residence of the child had been established in Australia because of the settled purpose of the family in its actions with the child there for nearly six months,  which was "a significant period of time for a four-year-old child."[20]  *Id.* at 224.  While in Australia, the child attended preschool and was enrolled in kindergarten for the following year, "participating in one of the most central activities of a child's life," according to the court.  *Id.*  The child had a degree of settled purpose in Australia, the court held, even if the mother never was fully on board in considering that the child's habitual residence.[21]  *Id.*

---

[20] In the case currently under consideration by this Court, Respondent's Proposed Findings of Fact Conclusions of Law and Summary [docket #38 at 8] cites the district court's holding in *Feder* but fails to note the Third Circuit's opinion that vacated that decision and came to the opposite conclusion regarding the child's habitual residence.

[21] Even the dissenting judge in *Feder*, who did not agree that six months could create a new habitual residence in that case,  indicated that a longer period could well suffice, stating, "I agree with the majority that there is a temporal element to this inquiry.  For example, two weeks in Australia certainly would not suffice for (the child)

Similarly, the Tenth Circuit has dealt with parents who had each applied the law of "grab and run" in an attempt to thwart one another's custody rights. *Ohlander v. Larson*, 114 F.3d 1531, 1537 (10th Cir. 1997)  "In an attempt to untangle the Gordian knot the parents, together, have seen fit to tie," the court indicated, in discussing the parents' repeated efforts to help themselves outside legitimate legal channels through "grab-and-run" law, that it would "refuse to condone such conduct." *Id*. at 1536-37 (particularly criticizing the mother's grab-and-run approach when a court order had already been issued).

### 4.   Tenth Circuit Procedural Guidelines for Handling Petitions

The Tenth Circuit in *Ohlander* addressed parents who had both filed petitions under the Hague Convention; thus, the court also provided specific details of the "proper interpretation of the Hague Convention's procedures." *Id.* at 1539.  The court criticized and ultimately reversed the district court for "misconstru(ing) the Convention's contemplated procedures." *Id*.  "According to the Convention, once a petition is filed, a court should consider only whether *respondent's* removals of a child are wrongful." *Id*. at 1540 (emphasis in original) (citing Hague Convention*,* arts. 3, 12, 51 Fed.Reg. at 10498, 10499, 42 U.S.C. § 11603(b), (e)).   The district court's consideration of "whether the *petitioner's* removals of the child were wrongful" was "antithetic to the Convention's intent as a whole." *Id.* (emphasis in original).  This

---

to establish a habitual residence there, and *after two years his mother would have been hard put to argue that (the United States) remained his home*.  Moreover, given that 'habitual residence' should not be over-encumbered by legal rules, I would not establish a bright-line time period necessary to establish residence.  Yet I cannot conclude that five and one-half months is so obviously sufficient that I would reverse the district court's finding as clearly erroneous." *Feder*, 63 F.3d at 232 (emphasis added).

indicates that the analysis properly proceeds unilaterally.  *Id*.  A court is to examine whether a respondent parent took the child wrongfully—not whether the petitioning parent did.  *Id*.  Similarly, exceptions to return run only one way—a respondent asserts them, not a petitioner.  Only when a cross petition is filed would bilateral analysis be appropriate.  *Id.*

5.    <u>Application to Current Petition</u>

In the case at hand, Respondent and Petitioner disagree most vehemently on the issue of habitual residence.  Petitioner asserts that the habitual residence is Mexico, where the children lived for two years and four months with the Respondent's eventual acquiescence.  (Supplemental brief, docket #40 at 2-4.)  Meanwhile, Respondent's primary theory of habitual residence relies on the children's birth and residence in the United States and Petitioner's removal of the children to Mexico without his permission or consent.  Thus, Respondent asserts the children's habitual residence remained the United States despite the occurrence of their residence in Mexico.  (Supplemental brief, docket #38 at 9.)

Looking at specific facts and circumstances, including "conduct, intentions and agreements of the parents during the time preceding the abduction," as directed by *Kanth* and suggested by *Feder*, the Court finds that the parents in this case shared an intent that the children's habitual residence would be Mexico.  This shared intent is sufficient for the Court to find that the parents had a "settled purpose" that the children's habitual residence would be Mexico, as described in *Kanth*.  While the Court believes it likely that Respondent did not initially agree to such a move nor did he immediately know that Petitioner planned a permanent move, even his own testimony

18

indicates he knew within weeks of Petitioner's intent to stay there.  Respondent testified that Petitioner first informed him of her intent to leave for Mexico the night before she left but did not indicate it was permanent.  He likewise admits that he did not do anything to try to stop them.  (Transcript, docket #37 at 175, 178.)  Further, Petitioner testified that during her phone call with Respondent, she told Respondent that the move was permanent.  (*Id*. at 66.)  The Court finds the distinction immaterial because Respondent testified that Petitioner told him via phone two weeks into her stay in Mexico that the move was permanent, to which he responded that he wanted her to send them back at least for a visit.  (*Id*. at 178-79.)  Indeed, he testified, "I told her many times that we could make arrangements for them to come visit even if it was just one week or two weeks, a maximum of two weeks . . ."  (*Id*. at 179.)

The Court finds Respondent's testimony credible that he continued his involvement with the children once they moved to Mexico, that he called them regularly, and that he sent them money.  However, these facts merely validate the argument that he knew where they were, knew they were integrating in school and the community, and yet still did not seek their return in any way.  As in *Mozes*, the Court also considers the significant passage of time.  Respondent allowed the children to stay in Mexico for two years and four months, which is long enough to create a "settled purpose" that this was the children's new habitual residence—if not by clear consent, then at least by clear acquiescence.  *Mozes*, 239 F.3d at 1081.

Similarly, Respondent's own testimony indicates that he knew the children were only coming to visit the United States for two weeks and that they would return home

to Mexico to start the school year.  This series of questions by the Court and answers by

Respondent illustrate the same:

> Q:  Mr. Marrufo, when you learned that your children were
> coming to the United States for a visit, did you plan to keep
> them here during that visit—and keep them in America and
> not let them return?
> A:  Never.
> Q. So if they would have only stayed two weeks you would
> have let them go home?
> A. Exactly.

(Transcript, docket #37 at 189.)  Respondent testified similarly regarding the planned

trip in August 2012 in an exchange with Petitioner's attorney:

> Q:  [W]hile the children were still in Mexico you planned
> with Miss Espinoza a trip for the children to come to
> Colorado?
> A:  Exactly.
> Q:  Okay.  And when you were planning the trip with Miss
> Espinoza, what was the purpose of the trip?
> A:  When I first talked to her, the plan was for them to come
> and visit me for two weeks, but after two days then she
> wouldn't tell me if they were coming to stay with me for
> that time or if they were going to be staying with her family
> for that time.  She didn't want to specify and so I didn't
> want to say anything to her because I wanted my kids to
> come visit.
> Q:  When you first knew they were in Colorado, did you
> think they were going to be here for two weeks?
> A:  That's right.
> Q:  And prior to this visit, do you agree the children were
> attending school in Mexico?
> A:  That's right.
> Q:  And after the two-week visit to Colorado, were the
> children going to go back to school in Mexico?
> A:  Yes.
> Q:  [W]hen the bus had pulled over, did you say that the
> children should stay for their two-week visit and you would
> return them after the two-week visit?
> A:  Yes.
> Q:  After you removed the children from the bus, you did
> not send them back to Mexico after a two-week visit; is that
> correct?

A: Exactly. . . . The reason I did not send them back was because of the harassment of the family. (Petitioner's family were) calling me at all hours of the day telling me that I had to send them back.

Q: . . . In August 2012 did you think the children should go back to Mexico after the visit?

A: That's right.

(*Id*. at 199-201.)

Regardless of his reasons, the Court finds that not unlike the grab-and-run parents in *Feder* and *Ohlander*, the Respondent utilized his own illegal version of grab-and-run law, taking matters into his own hands and running down a bus to wrongfully retain his children. He testified that he stopped the bus because he wanted his full two weeks of visitation, not to keep them permanently. As the Tenth Circuit made clear, the grab-and-run approach, usually referencing parents fleeing to another country but certainly applicable to parents seeking their own version of justice by grabbing and running to retain a child from his home in another country, is not honored under the Convention. *See Ohlander*, 114 F.3d at 1536-37. Respondent's final brief filed after the evidentiary hearing attempts to categorize the bus incident as Respondent having "acted with lawful assistance in order to reinstate the status quo of the habitual residence of his children." (Supplemental brief, docket #38 at 12.) The Court is not persuaded that the bus stoppage, tellingly rejected by both the City of Denver and City of Colorado Springs police departments, was legally authorized simply by the presence of a sympathetic City of Pueblo police officer willing to act unilaterally. Instead, the Court finds that Respondent wrongfully persuaded police to assist in order to take matters into his own hands to keep the children from returning to their habitual residence in Mexico. Furthermore, Respondent's attempt to reestablish their U.S.

habitual residence fails, because wrongfully retaining children for two months before their mother filed her Petition does not create a new "settled purpose" and change the habitual residence from Mexico.

Finally, Respondent continues to assert that Petitioner was the initial abductor back in April 2010 when she left for Mexico. Even assuming the truth of this assertion, the Court finds that the Respondent within the first year of their wrongful taking could have sought a legal remedy for their return. Importantly, he did not. He sought no legal remedy for their return, including failing to file his own Convention petition. Further, as the Tenth Circuit clearly directed in *Ohlander*, this Court is to evaluate the current petition in only one direction: "whether the *respondent's* removals of a child are wrongful." *Ohlander*, 114 F.3d at 1540 (emphasis in original). The Court's consideration of "whether the *petitioner's* removals of the child were wrongful" would be "antithetic[al] to the Convention's intent as a whole." *Id.* (emphasis in original). Therefore, Respondent's arguments concerning his efforts to regain his children, made years too late after the children have become well established in a new habitual residence to which he consented by his actions, and made without the required framework of a Convention petition, fall short. Similarly, his effort to file a new custody petition in Adams County, after the pending Convention Petition was filed, appears to the Court to be a *post hoc* effort to bolster his case. The Court thus concludes that the children's habitual residence is Mexico.

      B.      <u>Breach of Petitioner's Custody Rights under Mexican Law</u>

Having found that the children's habitual residence is Mexico, the Court must next assess whether Respondent breached Petitioner's custody rights under Mexican

law.   The Court first describes Convention concepts relating to rights of custody and then discusses Mexican law regarding rights of custody as it relates to Petitioner's rights and the breach of those rights.   Finally, the Court considers Respondent's assertion that Petitioner has only more limited rights of access.

"The Convention is very clear that the law of the country in which the child was habitually resident governs the decision as to whether custody rights existed at the time of removal.   *Shealy*, 295 F.3d 1124. The Convention defines "rights of custody" as "relating to the care of the person of the child and, in particular, the right to determine the child's place of residence."  Art. 5(a), Treaty Doc., at 2.

Rights of custody may be established "by operation of law or by reason of judicial or administrative decision."  Art. 3, Treaty Doc., at 2.  Another category, called rights of access, involves "the right to take a child for a limited period of time to a place other than the child's habitual residence."  Art. 5(b), Treaty Doc., at 2.   Rights of access are not generally protected by the Convention and ICARA.   *Gonzalez v. Gutierrez*, 311 F.3d 942, 952 (9th Cir. 2002).  When a parent with rights of custody is denied the ability to care for his or her children and determine where they should live because of the other parent's removal to or retention of a child in another country, the Convention labels that a breach of those rights.  Art. 3, Treaty Doc., at 2.

Mexican law, as outlined in the Civil Code for the State of Durango, Mexico, uses a concept called "*patria potestas*" ("parental authority/responsibility") to determine rights of custody.  (Docket #1-1.)  United States courts have determined that *patria potestas* creates rights of custody, not rights of access, and begins from birth. *Whallon v. Lynn*, 230 F.3d 450 (1st Cir. 2000).  While Durango's Civil Code does

provide ways that a parent with *patria potestas* can lose rights, the Code makes clear that such changes in rights of custody are made *judicially*, by order of a Mexican court, not automatically upon a parent's action. *Id.*, *Arts.* 410-16 (emphasis added).

Respondent asserts that Petitioner's initial "abduction" of the children to Mexico in April 2010 removed her rights of custody under *patria potestas*, leaving her with only "access rights."[22] Respondent thus proffers that Petitioner has not proven a breach of her custodial rights because such rights do not exist. (Docket #17 at 7.) The Court disagrees based on both fact and law. First, Petitioner, who cared for the children their entire lives until they were retained in the United States in August 2012, has custodial rights based on the Convention analysis, under Mexican law. The Convention for years has been recognized as providing the remedy of return only for a parent who has "rights of custody," not "rights of access." *See Croll v. Croll*, 229 F.3d 133, 135 (2d Cir. 2000). "Rights of access" cases frequently turned on a *ne exeat* right, which forbids one parent from removing a child from a country without the other parent or a court's consent. *Abbott*, 130 S. Ct. at 1987. The Supreme Court in *Abbott*, however, held that even this seemingly limited parental right, which lower courts in earlier years

---

[22] Mexican law under *patria potestas* does have a clause that indicates that an abducting parent may lose his or her custody rights. (Petition, docket #1, attachment 1.) Respondent here seeks to assert that portion of *patria potestas* should apply against Petitioner to establish that she had no rights of custody to breach because she took the children in 2010 and therefore lost all her rights under Mexican law. Ironically, however, the only way Mexican law applies is if the habitual residence of the children is found to be Mexico based on the children being there lawfully, which Respondent vehemently denies in his assertion that the habitual residence is the United States. Regardless, the Court, as discussed herein, need not examine Respondent's assertions of Petitioner's wrongful actions years ago. Therefore, while Mexican law applies, the Court notes that Petitioner did not have her rights converted to rights of access based on Respondent's allegations that she abducted the children nor does Respondent show that any court took away Petitioner's rights of custody based on any previous actions.

had frequently labeled a right of access, is actually a right of custody and therefore is acceptable to show a breach under an ICARA petition.   *Id.* at 1990.   Far broader, though, is the right of custody, which relates to the care of the child and the "right to determine the child's place of residence."   Art. 5(a), Treaty Doc., at 2.

Here, from the children's births until August 2012, Petitioner was intimately involved in the children's care and in decisions of where they should live, including during their time in Mexico, to which Respondent stipulated at the evidentiary hearing. (Transcript, docket #37 at 59.)   Further, Respondent proffered no evidence challenging Petitioner's fulfillment of her maternal responsibilities with the children at any point in their lives prior to their retention with him in August 2012.   Thus, the Court finds that Petitioner had rights of custody under Mexican law as described in *Whallon* that far exceeded mere rights of access as described in *Abbott*, and that Respondent breached those rights by retaining the children in the United States.

C.      Petitioner's Exercise of Custody Rights at Time of the Retention

Petitioner must show that she was exercising custody rights at the time of the removal of the children to the United States in August 2012.   This involves determining whether Petitioner's custody rights were "actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention."   *Abbott*, 130 S. Ct. at 1991-92 (citing Art. 3(b), Treaty Doc.).   A party "cannot fail to exercise those rights [of custody] short of acts that constitute clear and unequivocal abandonment of the child." *Bader v. Kramer*, 484 F.3d 666 (4th Cir. 2007).   Similarly, Mexican law, as discussed herein, presumes rights of custody for a birth parent unless a court has removed such rights.   Civil Code of Durango, §§ 410-16.

Here, Respondent stipulated at trial to Petitioner's care of the children but sought, as described herein, to label her rights as only those of access. Though Respondent asserts that Petitioner has no rights of custody, Respondent provides no evidence to undermine her exercise of custodial rights, nor does he dispute that Petitioner cared for the children as a loving mother would during the children's time in Mexico. The record shows that Petitioner enrolled the children in school, met their physical and religious needs, participated in their day-to-day lives, made decisions about their care, and lived with them as their primary caretaker until the August 2012 retention. (Transcript, docket #37 at 47-52.) Petitioner's actions come nowhere near the standard of "clear abandonment" used in U.S. courts via *Bader* and do not fall under violations of *patria potestas* in Mexican law. Further, the Court finds that under the Convention, Petitioner's care of the children until their removal demonstrates her exercise of those rights of custody at the time of their retention in the United States.

## III.    Respondent's Exceptions

Having determined that Petitioner has met her burden, the Court now considers whether any of the possible exceptions to return apply. Courts have held that such exceptions must be narrowly construed. *Tsai-Yi Yang v. Fu-Chiang Tsui*, 499 F.3d 259, 277 (3d Cir. 2007). The Court finds that Respondent has failed to prove that any of the exceptions apply.

Respondent's first available exception under the Convention would apply if Petitioner was not actually exercising her custody right at the time of retention or if she consented to or subsequently acquiesced in the retention. Here, Respondent asserts that Petitioner was not exercising rights of custody but rather rights of access. Because the

Court has discussed this thoroughly above, the Court concludes without further analysis that Petitioner had custody rights and was exercising those rights at the time of retention.   Respondent has not argued that Petitioner consented to or subsequently acquiesced in the retention.   Thus, the Court finds that Respondent fails to meet the requirements for this exception.

The second exception for Respondent is triggered if the proceeding was commenced more than one year after the abduction and the children have become settled in their new environment.  Respondent does not assert that Petitioner failed to file a timely Petition, but he does appear to assert that the children have become settled in the United States since August 2012, that the children have "reintegrated with their father," and that they are "prospering in the United States."  (Docket #24 at 8-10.) Similarly, Respondent indicates "the children have been reintegrated into their birth residence in the State of Colorado for a substantial period of time" and are "enjoy(ing) a healthy, safe, and nurturing environment where each shows progress."  (Docket #38 at 12.).  Regardless, this exception to return focuses primarily on the question of timeliness of the Petitioner's filing, not the nature of the children's comfort and integration after that filing.  Art. 12, Treaty Doc., at 4.  This exception would have possibly been relevant, for example, if Respondent had been the one to file a petition more than a year after the children left for Mexico and if Petitioner wanted to assert a defense that the children were already settled there.  Here, however, Petitioner swiftly sought return of the children to their habitual residence, filing her Petition in October 2012, within two months of their wrongful retention and well within the one-year Convention guideline.   (Docket #1.)   To allow Respondent to create a settled

environment during the pendency of the Petition would violate the spirit of the Convention, which "establishes a strong presumption favoring the return of a wrongfully removed child." *Danaipour v. McLarey*, 286 F.3d 1, 13-14 (5th Cir. 2002). Respondent has failed to persuade the Court that this exception applies.

The third exception available for Respondent involves proving grave risk that the return of the children would expose them to physical or psychological harm. This was initially proffered by Respondent in his trial brief [docket #24 at 9] but specifically abandoned by the stipulation of Respondent's counsel at the evidentiary that Respondent would no longer pursue this exception.[23] (Transcript, docket #37 at 95-96.) This exception does not apply.

The fourth exception Respondent may assert is that the return of the children would not be permitted by principles of the United States relating to the protection of human rights and fundamental freedoms. This was not asserted by Respondent, so this exception does not apply.

Similarly, the wishes of the children are not appropriate to consider in this case because of their young age. In fact, Respondent's trial brief indicated that "[s]ince the children are of such a tender age, consideration as to their desires may not be properly attributed great weight." (Trial brief, #24 at 10.) Moreover, neither party attempted to introduce evidence or present argument relating to this exception.

---

[23] At the evidentiary hearing, the Court asked Respondent's counsel whether he would be relying on risk to the children living in Mexico, and he stated, "It was in the trial brief, Your Honor. But let's be candid. I don't believe we can provide such evidence or proof." (Transcript, docket #37 at 95.) Counsel then stated that he would "withdraw that," upon which the Court determined that "the issue of safety in Mexico is no longer relevant." *Id*. at 96.

Therefore, Respondent has failed to prove that any of the exceptions to the children's return should apply.

## **CONCLUSION**

The Court concludes that Petitioner has established by a preponderance of the evidence all three elements to prove her prima facie case as required by the Convention: that the children's habitual residence prior to the wrongful retention was Mexico; that the wrongful retention of the children in the United States breached her custody rights under Mexico's law; and that she was exercising custody rights at the time of the removal.  Meanwhile, the Court finds that Respondent has failed to establish any of the exceptions available to him through the Convention.

Thus, based on the foregoing and the entire record provided to the Court, I do respectfully RECOMMEND that the District Court **grant** the pending Petition for the Immediate Return of Children to Petitioner Under the Hague Convention on the Civil Aspects of International Child Abduction and the International Child Abduction Remedies Act [filed March 27, 2013; docket #1], order prompt return of the children to Petitioner in Mexico, and consider Petitioner's request under 42 U.S.C. § 11607 related to payment of expenses incurred by Petitioner or on her behalf, including court costs, legal fees, or other costs during the course of the proceedings in the action and in their return.

Dated this 31st day of July, 2013, in Denver, Colorado.

BY THE COURT:

*Michael E. Hegarty*

Michael E. Hegarty
United States Magistrate Judge